Filed 1/20/21 P. v. Prince CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. AUBREY LAMONT PRINCE et al., Defendants and Appellants. | B297599 (Los Angeles County Super. Ct. No. MA074878) |

APPEALS from judgments of the Superior Court of Los Angeles County, Denise McLaughlin-Bennett, Judge. Judgment as to Anderson is affirmed. Convictions as to Prince are affirmed, and the matter is remanded for resentencing.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant Aubrey Lamont Prince.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Mykael Thomas Anderson.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Stephanie A. Miyoshi and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Aubrey Lamont Prince and Mykael Thomas Anderson not guilty of attempted murder but guilty of the lesser included offense of attempted voluntary manslaughter, as well as felony possession of firearms and ammunition. On appeal they raise a number of challenges to their convictions, including insufficient evidence, evidentiary error, improper instructions and prosecutorial misconduct and also argue the trial court committed sentencing error. We affirm the convictions of both men and the sentence as to Anderson. As to Prince only, we remand for resentencing.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Second Amended Information*

On January 24, 2019 Prince and Anderson were each charged in a second amended information with one count of attempted murder (Pen. Code, §§ 187, subd. (a), 664)[1] (count 1) with special firearm-use allegations pursuant to section 12022.53. In addition, Prince was charged with two counts of carrying a loaded firearm while an active participant in a criminal street gang (§ 25850, subds. (a), (c)(3)) (counts 2 and 6) and two counts of unlawfully possessing ammunition (§ 30305, subd. (a)(1)) (counts 3 and 7). Anderson

_____

[1] Statutory references are to this code unless otherwise stated.

was additionally charged with one count of carrying a loaded firearm while an active member in a criminal street gang (§ 25850, subds. (a), (c)(3)) (count 4) and one count of unlawfully possessing ammunition (§ 30305, subd. (a)(1)) (count 5). It was further alleged each offense had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A) and (C)).

2. *The Evidence at Trial*

a. *The shooting*

On the night of August 30, 2015 Prince and Anderson went to a liquor store near Anderson's house to purchase snacks for Anderson's wife. As they left the store, they saw Darcel Jackson pacing in the middle of the street near the store's entrance. Prince and Anderson initially walked past Jackson, but after a few moments they turned around to face him. Following a brief exchange, Prince and Anderson drew weapons and shot at Jackson. Jackson was hit multiple times, including in his back and buttocks.

A bystander called police to report the shooting and stated he had heard 12 gunshots and seen a black car with red racing stripes leave the scene shortly after the shooting.

The liquor store's video surveillance system recorded the incident from various angles. Throughout the trial the jury was shown footage depicting the shooting and the moments leading up to it.

b. *Jackson's testimony*[2]

Jackson's account of the incident varied over the course of the police investigation and trial. During an interview with police in February 2018, Jackson said he did not remember exactly what had happened the night of the shooting. He thought Prince and Anderson had initiated the interaction by speaking to him and he had been shot while running away. He recalled Prince and Anderson were approximately two car-lengths away from him when he was shot. In an October 2018 police interview Jackson again said Prince and Anderson spoke to him first by asking where he was from. Jackson told them he was a member of E-Dubs, which is a Bloods-affiliated criminal street gang.

During his preliminary hearing testimony in November 2018, Jackson admitted he was at the liquor store to meet his marijuana dealer. He initially stated he did not recall who initiated the encounter with Prince and Anderson prior to the shooting. Upon further questioning, however, Jackson again said Prince and Anderson spoke first, asking him where he was from. He replied he was a member of E-Dubs. Later in his testimony he said it was possible he had accosted Prince and Anderson and could not recall whether he had pretended to have a gun by reaching under his shirt in an effort to make them back away.

---

[2]     At the beginning of trial Jackson could not be located and was ruled unavailable pursuant to Evidence Code section 240. Accordingly, audio recordings of two police interviews with Jackson were played, and his preliminary hearing testimony was read aloud for the jury. Jackson was subsequently located and testified in person.

4

When he testified at trial, Jackson initially stated he was unsure who had spoken first prior to the shooting; but he later admitted he may have initiated the encounter by saying, "What have you got?" and telling Prince and Anderson to give him everything they had. Jackson also testified he could not be certain, but he thought he was at the gas station that night to buy drugs.

As a result of the shooting Jackson wore a colostomy bag and had multiple scars on his wrist, stomach and neck.[3]

c. *The People's firearm expert*

Phil Teramoto, a senior criminalist in the Los Angeles County Sheriff's Department's firearms identification section, testified regarding the type of weapon used to shoot Jackson. He stated seven shell casings had been found at the scene and they had all been fired from the same semiautomatic handgun. They could not have been fired from a revolver because revolvers do not eject shell casings.

In reviewing the video footage Teramoto observed the person in white, later identified as Prince, could be seen pointing a gun with a muzzle flash coming out of it. Teramoto explained the muzzle flash indicated Prince was firing the gun. Teramoto only saw one muzzle flash from Prince's gun in the video; but he admitted that, given the video quality and the number of frames

_____

[3]    It is unclear from Jackson's various statements whether he was shot twice—once in the buttocks with the bullet travelling to his stomach and once in the back with the bullet travelling to his lungs, neck and then wrist—or whether he was shot three times—once in the buttocks, once in the back and a separate shot into his wrist.

per second, it was possible two muzzle flashes had occurred. In Teramoto's opinion it was unlikely Prince could have fired seven times during the approximately two seconds he had his arm raised. Teramoto could not determine if Prince had been holding a revolver or a semiautomatic handgun.

Teramoto also stated he could see Anderson in the video holding something in his extended hand, but there were no muzzle flashes coming from Anderson's outstretched arm. Teramoto could not determine what object Anderson had been holding.

### d. *The arrests of Prince and Anderson*

Prince was arrested on August 11, 2016 after police executed a search warrant at his home. During the search of his home police found clothing associated with Whitsett Avenue Gangster Crips and clothing with Prince's gang moniker printed on it. Police also searched Prince's girlfriend's car, which was the same make and model as the car seen leaving the scene of the shooting. The car did not have red racing stripes at the time of Prince's arrest, but his girlfriend testified it had red racing stripes at some point. In the car police found three loaded handguns and additional ammunition.

Anderson was arrested one week later, on August 17, 2016. When police searched Anderson's home at the time of his arrest, they found a box of ammunition in a safe in the closet. Police also found clothing associated with the Whitsett Avenue Gangster Crips and clothing with Anderson's gang moniker printed on it.

During an interview with police the day after his arrest, Anderson told police that on the night of the shooting he had been holding a taser. Later in the interview he said it had been a BB gun. Audio recordings were played to the jury of telephone

calls Anderson made from jail a few days after his arrest. In one call Anderson told his wife that, in the surveillance video the police had showed him, he could see the other person's gun firing but, "They don't show my shit. . . . On my shit, they don't show me, like they show me lifting, but no sparks." When his wife asked what he was lifting, Anderson replied, "The BB gun."

e. *The gang evidence*

Prince stipulated he had been an active member of the Whitsett Avenue Gangster Crips on August 30, 2015.

Sergeant Matthew Harer of the Los Angeles Police Department, the People's gang expert, testified Prince and Anderson had tattoos and wore clothing identifying them as members of the Whitsett Avenue Gangster Crips. They also associated with known members of the gang and spent time at a park known to be frequented by gang members. Based on this and Anderson's self-identification as a Whitsett Avenue member to three police officers in 2010 and 2014, Harer testified Anderson was an active member of the gang in August 2015.

Given a hypothetical similar to the shooting in this case, Sergeant Harer opined the shooting was committed for the benefit of, and in association with, a criminal street gang. He explained gangs thrive on violence; by showing the gang was willing to shoot a rival, it gains power and influence. Harer also stated the shooting would benefit the gang by eliminating a rival and helping with recruitment.

f. *Witnesses for Prince*

Prince presented testimony from two expert witnesses: David Kim on firearm forensics, and Thomas Guzman-Sanchez

on video recording technology. Prince also testified in his own defense.

Kim, a retired forensics firearms examiner for the Los Angeles County Sheriff's Department, opined that the shell casings found at the scene had not been fired by Prince. Based on the size and brightness of the muzzle flash in the video, Kim was 90 percent sure Prince had fired a revolver, which would not have ejected shell casings, and not a semiautomatic handgun, which would have ejected shell casings. Kim also stated, even if Prince had been firing a semiautomatic handgun, he could not have fired seven bullets in the few seconds the video showed him shooting. In addition, the shell casings would have landed in a different area than they had been found. In rebuttal to this testimony, the prosecution presented the testimony of Robert Keil, a supervising criminalist with the Los Angeles County Sheriff's Department's firearms identification section. Keil agreed with Kim that revolvers tended to have more muzzle flash than semiautomatic handguns. However he did not believe it was possible to determine from the video which type of weapon Prince had fired.

Guzman-Sanchez, who had 30 years of experience in the television, film and recording industry, testified regarding the surveillance video from the night of the shooting. Guzman-Sanchez explained there were lighter pixels in the images near Anderson's extended hand, which could be the result of smoke coming out of the object Anderson was holding. On cross-examination Guzman-Sanchez stated the video footage showing Prince and Anderson during the shooting was recorded at a speed of one frame per second. Because of that, he explained, if something was moving very quickly, the camera might not record each movement. Specifically, he conceded, there could have been

additional muzzle flashes from Prince's gun that were not captured on the video recording.

Prince testified he had been a member of the Whitsett Avenue Gangster Crips for more than 10 years and was an active member of the gang in 2015 and 2016. He admitted he had been carrying a loaded revolver the night of the shooting. He explained he always carried a gun because it made him feel safe. He would rather be arrested for carrying a gun then risk being attacked when he did not have a gun.

Prince testified he drove to the liquor store with Anderson on August 30, 2015 in his girlfriend's car—a black sedan with red racing stripes. After making a purchase in the store, Prince and Anderson were walking to the car when Prince saw Jackson pacing back and forth in the middle of the street. As Prince and Anderson continued walking past Jackson, Prince heard Jackson say, "Hey, whatcha got on you?" or "Hey whatcha you got?" Prince was initially confused and did not know whether Jackson was trying to purchase drugs or trying to rob him. Prince turned to face Jackson and asked him what he had said. According to Prince, Jackson aggressively responded, "Bitch ass, you know what I mean. Whatcha you got on you?" At that point Prince became "100 percent certain" Jackson was trying to rob him. Prince testified, "I was definitely afraid, given the circumstances and his demeanor. He kept looking over his shoulder like before—before he asked me he kept looking over his shoulder, then he reached under his shirt and I was—I was—I was—I was certain I was going to be shot." Panicked, Prince grabbed his gun from his pocket and fired two shots at Jackson. Prince testified he was not trying to kill Jackson but simply wanted to defend himself. After firing, Prince ran back to the car.

Anderson arrived at the car a couple seconds later, and they drove away.

Prince did not know whether Anderson fired a gun at Jackson, but Prince did hear gunfire after he had stopped shooting. Anderson was not holding a gun when he got into the car. Prince testified Anderson was an active gang member in August 2015.

Prince admitted the guns and ammunition recovered from his girlfriend's car in August 2016 belonged to him.

g. *Witnesses for Anderson*

Anderson's mother testified regarding the ammunition found at the time of Anderson's arrest. She said Anderson had been living with her when he was arrested, and the ammunition the police found belonged to her ex-husband who had lived in the house in 2010.

Anderson also presented testimony from Alex Alonso, a college professor who had been studying criminal street gangs and interviewing gang members for 30 years. Alonso explained gang members did not always act in association with, or for the benefit of, a criminal street gang; they sometimes acted in their own self-interest. After being given a hypothetical similar to the shooting in this case, Alonso stated it seemed as if the shooters acted spontaneously and not for the benefit of their gang. However, on cross-examination, when asked whether it would change his opinion if the victim had initiated the conversation by asking where the shooters were from, Alonso said it may be more likely the shooting was for the benefit of the gang.

3. *The Verdict*

The jury found Prince and Anderson not guilty of attempted murder but guilty of the lesser included offense of attempted voluntary manslaughter. In connection with that offense the jury found true the special allegations Prince and Anderson had caused great bodily injury to Jackson and not true that they had committed the offense for the benefit of a criminal street gang.

The jury also found Prince guilty of carrying a loaded firearm on the date of the shooting (count 2) and the date of his arrest (count 6) and guilty of unlawful possession of ammunition on the date of the shooting (count 3) and the date of his arrest (count 7). In connection with counts 2 and 6 the jury found true the special allegations Prince was an active participant in a criminal street gang at the time of the offenses. In connection with counts 3 and 7 the jury found true the special allegations Prince was prohibited from owning or possessing a firearm due to a prior felony conviction.[4] As to counts 2, 3, 6 and 7 the jury found true the special allegations Prince committed the offenses for the benefit of, or in association with, a criminal street gang.[5]

Anderson was found guilty of carrying a loaded firearm on the date of the shooting (count 4) and of unlawful possession of ammunition at the time of his arrest (count 5). In connection

---

[4]   During trial Prince stipulated he had been convicted in 2013 of felony carrying of a concealed weapon (§ 25400, subd. (a)(2)).

[5]   During closing argument Prince's counsel conceded Prince was guilty of counts 2, 3 and 7 but maintained the offenses were not committed for the benefit of a criminal street gang.

11

with count 4 the jury found true the special allegation Anderson was an active participant in a criminal street gang. As to count 5 the jury found true the special allegation Anderson was prohibited from owning or possessing a firearm due to a prior felony conviction. In connection with count 4 the jury found Anderson committed the offense for the benefit of a criminal street gang but found the gang allegation not true as to count 5.

4. *Sentencing*

The trial court sentenced Prince to an aggregate state prison term of 13 years two months: the upper term of five years six months for count 1, plus three years for the great bodily injury enhancement; a consecutive term of eight months (one-third the middle term) for count 2, plus one year for the gang enhancement; a consecutive term of eight months (one-third the middle term) for count 3, a consecutive term of eight months (one-third the middle term) for count 6, plus one year for the gang enhancement; and a consecutive term of eight months (one-third the middle term) for count 7.

Anderson was sentenced to an aggregate state prison term of 10 years 10 months: the upper term of five years six months for count 1, plus three years for the great bodily injury enhancement; a consecutive term of eight months (one-third the middle term) for count 4, plus one year for the gang enhancement; and a consecutive term of eight months (one-third the middle term) for count 5.

# DISCUSSION[6]

1. *Substantial Evidence Supports the Convictions*

    a. *Standard of review*

In considering a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor

---

[6]    Pursuant to California Rules of Court, rule 8.200(a)(5), Prince and Anderson have joined in each other's arguments to the extent those arguments may benefit them.  We have reviewed each of the issues in light of that joinder but have found no instance in which our resolution of the issue requires a different outcome for the other defendant.  (See generally *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11 ["[j]oinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice"].)

13

evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Dalton* (2019) 7 Cal.5th 166, 243-244; *People v. Penunuri* (2018) 5 Cal.5th 126, 142.) "'Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.'" (*People v. Clark* (2016) 63 Cal.4th 522, 626.)

> b. *Substantial evidence supports Anderson's conviction*
> *for attempted voluntary manslaughter*

A jury may convict a defendant of voluntary manslaughter by finding the defendant killed the victim with either intent to kill or conscious disregard for human life. (*People v. Lasko* (2000) 23 Cal.4th 101, 104; *People v. Blakeley* (2000) 23 Cal.4th 82, 91.) A conviction for attempted voluntary manslaughter, however, requires proof the defendant had the specific intent to kill the victim. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549-1550 ["If the crime of attempted murder requires a specific intent to bring about a desired result (the killing of a human being), then it appears to us that the crime of attempted voluntary manslaughter must also require a specific intent to bring about that same desired result (the killing of a human being)"]; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 710 ["attempted voluntary manslaughter cannot be premised on the theory the defendant acted with conscious disregard for life, because it would be based on the 'internally contradictory premise' that one can intend to commit a reckless killing"].) "Mental state and

intent are rarely susceptible of direct proof and must therefore be proven circumstantially." (*People v. Thomas* (2011) 52 Cal.4th 336, 355.) "'An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence.'" (*People v. Elliot* (2005) 37 Cal.4th 453, 466.)

The prosecutor sought to prove Anderson was guilty of attempted murder by establishing Anderson fired a gun at Jackson.[7] In the alternative, if the jury believed Anderson had not fired a gun that night, the prosecutor argued Anderson was guilty because he aided and abetted Prince in the attempted murder. Anderson contends there was not substantial evidence to support his conviction under either theory. Specifically as to whether there was evidence he was guilty as a direct perpetrator, Anderson argues there was no "independent evidence to establish an intent to kill" because "the evidence was unclear on which defendant fired the gun whose shots came close to or hit" Jackson.

Reviewing the record in the light most favorable to the prosecution, ample evidence supports a finding Anderson fired a gun at Jackson with the intent to kill him. The evidence established Prince and Anderson were involved in an altercation with Jackson that resulted in Jackson being shot multiple times. Anderson admitted in police interviews and on telephone calls

---

[7] Attempted voluntary manslaughter is a lesser included offense of attempted murder "whenever the evidence is such that a jury could reasonably conclude that the defendant [attempted to kill] the victim in the unreasonable but good faith belief in having to act in self-defense." (*People v. Barton* (1995) 12 Cal.4th 186, 201; see discussion in section 2(b).)

15

from jail that he pointed a weapon at Jackson, although he denied the weapon was a firearm. The seven shell casings found at the scene had all been fired from the same semiautomatic handgun. Prince testified he had fired two shots at Jackson from a revolver, which the testifying firearms experts agreed would not have expended the recovered shell casings. If the jury believed Prince's testimony, it was a reasonable inference the expended shell casings must have come from Anderson's weapon. Even if the jury did not believe Prince and concluded he had fired the gun that ejected the shell casings, there was testimony from Prince's video expert that there appeared to be smoke coming from the weapon in Anderson's outstretched hand. There was also testimony from two firearms experts stating it was highly unlikely Prince could have fired seven shots in the time shown in the surveillance video. In addition, the jury repeatedly viewed the surveillance video of the shooting, from which they could evaluate Anderson's actions. Based on this evidence, a reasonable trier of fact could find Anderson fired a gun at Jackson.

Anderson alternatively argues, even if he had fired a gun, there was no evidence a bullet he fired "came close to or hit" Jackson and there was no independent evidence to establish an intent to kill. This argument is without merit. "'"[T]he act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill.'"'" (*People v. Perez* (2010) 50 Cal.4th 222, 230 [intent to kill could be inferred where defendant fired a single shot at a group of eight people from a distance of 60 feet]; accord, *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1225 [firing at least six

shots from distance of approximately 25 feet indicated "clear intent to kill"].)  Anderson's decision to flee the scene while Jackson was still alive "does not compel the conclusion that he lacked the animus to kill in the first instance." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945.)  "Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind." (*Ibid*.; accord, *People v. Cardenas* (2020) 53 Cal.App.5th 102, 120-121 ["[t]hat the bullets struck Chris and Juan in their feet and ankles similarly does not show that there was insufficient evidence of specific intent to kill them. . . .  [A] reasonable inference that could be drawn from that evidence is that Cardenas intended to shoot to kill both Chris and Juan but had poor aim"].)

  c. *There was substantial evidence to support a finding Anderson personally inflicted great bodily injury*

   Section 12022.7, subdivision (a), provides a three-year sentence enhancement for "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony . . . ."  "Great bodily injury" is statutorily defined as "a significant or substantial physical injury."  (§ 12022.7, subd. (f); see CALCRIM No. 3160 ["Great bodily injury means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm"].)  "A defendant 'personally inflicts' great bodily injury if he directly causes the injury—that is, if the defendant 'himself' 'actually inflicts the injury' by 'directly perform[ing] the act that causes the physical injury.'" (*People v. Ollo* (2019) 42 Cal.App.5th 1152, 1156, review granted Mar. 18, 2020, S260130; accord, *People v. Cardenas* (2015) 239 Cal.App.4th 220, 228 ["'for the

[great bodily injury] enhancement to apply, the defendant must be the direct, rather than the proximate, cause of the victim's injuries'"].)

Anderson argues there is insufficient evidence to support a finding he personally inflicted great bodily injury on Jackson because there was no evidence he actually fired a gun. However, as discussed, ample evidence supported the jury's finding Anderson fired a gun at Jackson and, thus, that he personally inflicted great bodily injury. (See *In re Sergio R.* (1991) 228 Cal.App.3d 588, 601-602 ["where, as here, more than one assailant discharges a firearm into a group of people and 'it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered'"]; *People v. Corona* (1989) 213 Cal.App.3d 589, 594; see also *People v. Modiri* (2006) 39 Cal.4th 481, 498 ["a personal-infliction finding could nonetheless be made if defendant personally applied force to the victim, and such force was sufficient to produce grievous bodily harm either alone or in concert with others"].)

> d. *There was substantial evidence to support a finding Prince was an active participant in a criminal street gang on August 11, 2016 for purposes of section 25850, subdivision (c)(3)*

Section 25850, subdivision (a), prohibits the carrying of a loaded firearm in public either on one's person or in a vehicle. The offense is generally a misdemeanor but is elevated to a felony if the defendant "is an active participant in a criminal street gang, as defined in subdivision (a) of Section 186.22." (§ 25850, subd. (c)(3).) Conviction of a felony violation of section 25850

18

based on active participation in a criminal street gang "require[s] proof of each element 'of the offense described in section 186.22(a). Those elements are "actively participat[ing] in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity" and "willfully promot[ing], further[ing], or assist[ing] in any felonious criminal conduct by members of that gang."'" (*People v. Infante* (2014) 58 Cal.4th 688, 692; accord, *People v. Lamas* (2007) 42 Cal.4th 516, 519.)

In establishing the defendant promoted, furthered or assisted in felonious criminal conduct by members of the gang, the prosecution must present evidence of "*felonious* criminal conduct that is *distinct from* [the] otherwise misdemeanor conduct of carrying a loaded firearm in public . . . ." (*People v. Lamas, supra,* 42 Cal.4th at p. 520.) In other words, the charged act of carrying a loaded firearm cannot be the predicate act upon which the finding of gang membership is based. (See *People v. Infante, supra,* 58 Cal.4th at pp. 693-694 [section 25850, subdivision (c), "requires proof that the charged gang participant willfully promoted, furthered, or assisted *felonious* conduct by fellow gang members *before* one may consider whether that provision applies to elevate to a felony what would otherwise be the misdemeanor act of unlawfully carrying a loaded firearm in public"].) However, the alleged felonious conduct need not have occurred in conjunction with or at the same time as the charged firearm offense. (See *People v. Schoppe-Rico* (2006) 140 Cal.App.4th 1370, 1381 ["the Legislature intended the street gang firearms statutes to make it possible to convict active gang members of a felony whenever they are found in possession of a loaded or concealed firearm, even when the prosecution cannot

establish any temporal or causal connection between the firearm possession and gang activity"]; see also *People v. Robles* (2000) 23 Cal.4th 1106, 1114 ["it is entirely plausible that the Legislature may have enacted section 12031(a)(2)(C) [now section 25850, subd. (c)(3)] to cover a situation not subject to felony punishment under section 186.22(a): when the person carrying the loaded firearm *at some other time* committed a violation of section 186.22(a)"].)

Prince argues insufficient evidence supported the finding he was an active participant in a criminal street gang at the time of his arrest on August 11, 2016 and, therefore, he could not be convicted of a felony violation of section 25850 on count 6.[8] Prince does not argue he was not a member of a criminal street gang on August 11, 2016, nor does he argue he did not have knowledge members of the gang engaged in a pattern of criminal activity.[9]  He argues only that there was insufficient evidence he willfully promoted, furthered or assisted in felonious criminal activity because "there is no evidence that appellant acted other than alone when guns and ammunition he owned were found in the [car] parked outside of his apartment on August 11, 2016."

---

[8]     Prince does not challenge the jury's finding he was an active member of a criminal street gang at the time of the shooting for purposes of section 25850 (count 2), nor does he challenge the findings he acted for the benefit of a criminal street gang on counts 2, 3, 6 and 7.

[9]     Prince stipulated at trial that he was an active member of a criminal street gang on August 30, 2015.  When asked during cross-examination whether he was "still an active member of the gang" on August 11, 2016, Prince responded, "Yes, sir."

Contrary to Prince's argument, there is no requirement the defendant act in concert with other gang members at the time of his or her arrest for carrying a loaded firearm in order for the offense to be elevated to a felony. Prince appears to be relying on a misapprehension of the Supreme Court's statement in *People v. Rodriguez* (2012) 55 Cal.4th 1125, in which the Court held a conviction for the substantive offense of participation in a criminal street gang (§ 186.22, subd. (a)) "requires that felonious criminal conduct be committed by at least two gang members." (*Rodriguez*, at p. 1148.) Here, however, Prince was not convicted of the substantive offense of participation in a criminal street gang. As discussed, elevation of a section 25850 violation based on gang membership requires the elements of section 186.22, subdivision (a), be satisfied by conduct that took place separately from, and not necessarily at the same time as, the firearm offense. (See *People v. Infante, supra,* 58 Cal.4th at pp. 693-694; *People v. Schoppe-Rico*, *supra*, 140 Cal.App.4th at p. 1381.) Accordingly, whether Prince acted alone when carrying the loaded firearms is of no moment. There was sufficient evidence Prince had assisted in felonious criminal conduct by members of the gang prior to August 2016, including the jury's finding Prince was an active gang member pursuant to section 186.22, subdivision (a), in August 2015 for purposes of count 2, a finding Prince does not challenge on appeal, and the finding Prince and another gang member (Anderson) had committed attempted voluntary manslaughter on August 30, 2015, as charged in count 1.

2. *The Trial Court Did Not Commit Instructional Error*

    a. *Standard of review*

A trial court in a criminal case has a duty to instruct on general principles of law applicable to the case (*People v. Young* (2005) 34 Cal.4th 1149, 1200), that is, "'""those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."'""" (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) This obligation includes the sua sponte duty to instruct the jury on the definition of the substantive offenses charged and the elements of any applicable sentencing factors alleged. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 327; *People v. Robles*, *supra*, 23 Cal.4th at p. 1115; see also CALCRIM Nos. 2540-2546; see generally *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [120 S.Ct. 2348, 147 L.Ed.2d 435] ["[o]ther than the fact of a prior conviction, any fact that increases the penalty of a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"].) The court also must instruct the jury on a lesser included offense if the evidence raises a question as to whether the elements of the lesser-included offense are present. (*Valdez*, at p. 115; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) Likewise, a trial court must instruct on an asserted defense, including self-defense, if there is sufficient evidence from which a reasonable juror could find the defense applicable. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1046; *Breverman*, at p. 154.) A court may, however, "properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.'" (*People v. Burney* (2009) 47 Cal.4th 203, 246.)

We review defendants' claims of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine '"whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 831.) Failure to instruct the jury on an element of an offense or sentencing factor "is reversible under [*Chapman v. California* (1967) 386 U.S. 18, 24], unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict." (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 326; accord, *People v. Merritt* (2017) 2 Cal.5th 819, 827.) In other words, the harmless error inquiry regarding an element omitted from the jury instructions requires the reviewing court to determine if it is clear beyond a reasonable doubt a rational jury would have found the defendant guilty absent the error. (*Merritt*, at p. 827; see *People v. Gonzalez* (2012) 54 Cal.4th 643, 666 ["[w]e have exhaustively reviewed the trial evidence to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element'"]; *People v. Mil* (2012) 53 Cal.4th 400, 417 ["[o]ur task, then, is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element'"].)

b. *The trial court properly instructed on self-defense*

Self-defense, when based on a reasonable belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification for homicide; such a killing is not a crime. (§ 197, subd. (3); *People v. Elmore* (2014) 59 Cal.4th

121, 133-134.)  When the defendant kills under an actual but unreasonable belief in the necessity to use deadly force to defend against imminent peril to life or great bodily injury, the conduct, while not justifiable, reduces a homicide from murder to voluntary manslaughter.  (*Elmore*, at p. 134; see *People v. Barton* (1995) 12 Cal.4th 186, 199.)  Accordingly, "when a defendant is charged with murder the trial court's duty to instruct sua sponte . . . on unreasonable [i.e., imperfect] self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense."  (*Barton*, at p. 201.)

Prince and Anderson contend the trial court erred by failing to instruct the jury on complete self-defense with CALCRIM No. 505,[10]  and, absent that instruction, "the jury could not have known that appellant[s] should be acquitted if the

---

[10]    CALCRIM No. 505 states:  "The defendant is not guilty of (murder/ [or] manslaughter/attempted murder/ [or] attempted voluntary manslaughter) if (he/she) was justified in (killing/attempting to kill) someone in (self-defense/ [or] defense of another). The defendant acted in lawful (self-defense/ [or] defense of another) if:  [¶]  1. The defendant reasonably believed that (he/she/ [or] someone else/ [or] <insert name or description of third party>) was in imminent danger of being killed or suffering great bodily injury [or was in imminent danger of being (raped/maimed/robbed/ <insert other forcible and atrocious crime>)]; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger."

24

jury found that [they] acted in [complete] self-defense."[11]  This position ignores the trial court's instruction with CALCRIM No. 604 regarding imperfect self-defense, which included the instruction that, "If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime.  The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable."[12]

---

[11]  Anderson's opening brief on appeal included a statement that the trial court erred in failing to instruct the jury with CALCRIM No. 3471 (mutual combat/initial aggressor self-defense).  However, his opening brief does not contain argument or support for this position.  The issue therefore has been forfeited.  (Cal. Rules of Court, rules 8.204(a)(1)(B), 8.360(a); see *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1372, fn. 12.)

[12]  As given, CALCRIM No. 604 states, in part:  "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill a person because he acted in imperfect self-defense.  [¶]  If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.  [¶]  The defendant acted in imperfect self-defense if:  [¶]  1. The defendant took at least one direct but ineffective step toward killing a person.  [¶]  2. The defendant intended to kill when he acted.  [¶]  3. The defendant believed that he was in imminent danger of being killed or suffering great bodily injury.  AND  [¶]  4. The defendant believed that the immediate use of deadly force was necessary to defend

In his reply brief Prince argues this language was insufficient to instruct the jury on complete self-defense because it gave "the jury no guidance on how to evaluate what is or is not reasonable." Prince maintains the language in CALCRIM No. 604 on this point ("[i]n evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant") was not sufficient because it was not as complete as the language of CALCRIM No. 505 ("[w]hen deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed").

While CALCRIM No. 505 contains additional clarification of complete self-defense, the unambiguous language in No. 604 adequately instructed the jury it must find Prince and Anderson not guilty of attempted murder and attempted voluntary manslaughter if their belief in the need to defend themselves from imminent danger was reasonable. In addition, neither Prince nor Anderson has asserted the self-defense instruction given was incorrect or misleading. Because any additional instruction would have been duplicative, there was no error in the court's failure to instruct with No. 505. (See *People v. Moon* (2005) 37 Cal.4th 1, 32 [failure to give requested instruction not error because "it was duplicative of the instructions the court gave the jury"]; see also *People v. Cordero* (1989) 216 Cal.App.3d 275, 279 [failure to give instruction on imperfect self-defense not error because other instructions explained there was no malice

---

against the danger. BUT [¶] 5. At least one of the defendant's beliefs was unreasonable."

aforethought if defendant had honest but unreasonable belief in necessity to defend himself].)

### c. *Any error in failing to instruct the jury on the definition of "felonious criminal conduct" on count 6 was harmless*

The court instructed the jury on count 6 (carrying a loaded firearm as an active gang member on August 11, 2016) with the elements of section 25850, subdivision (a), (CALCRIM No. 2530) and the elements of the gang participant sentencing factor of subdivision (c)(3) (CALCRIM No. 2542). As given, CALCRIM No. 2542 instructed that, to find Prince was an active member in a criminal street gang for purposes of section 25850, subdivision (c)(3), the prosecution must prove Prince was an active member in a gang at the time of the offense, he knew members of the gang engaged in a pattern of criminal activity and he "willfully assisted, furthered or promoted felonious criminal conduct by members of the gang either by: (a) directly and actively committing a felony offense; or, (b) aiding and abetting a felony offense. At least two members of that same gang must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang." The court did not include the portion of the pattern instruction defining "felonious criminal conduct," enumerating the specific felony offenses the gang members were alleged to have committed and explaining the elements of "aiding and abetting" liability.[13]

---

[13] The portion of CALCRIM No. 2542 Prince argues should have been included states: "Felonious criminal conduct means committing or attempting to commit [any of] the following

27

Prince contends these omissions constituted prejudicial instructional error by "reliev[ing] the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense in violation of appellant's rights under both the United States and California Constitutions."[14]  We need not determine whether the instruction as given adequately protected Prince's right to have the elements of the sentencing factor submitted to the jury because any error in failing to instruct the jury was harmless beyond a reasonable doubt.

---

crime[s]: *<insert felony or felonies by gang members that the defendant is alleged to have furthered, assisted, or promoted>*.  [¶] To decide whether a member of the gang [or the defendant] committed *<insert felony or felonies listed immediately above and crimes from Pen. Code, § 186.22(e)(1)-(33) inserted in definition of pattern of criminal gang activity>*, please refer to the separate instructions that I (will give/have given) you on (that/those) crime[s].  [¶]  To prove that the defendant aided and abetted felonious criminal conduct by a member of the gang, the People must prove that:  [¶]  1. A member of the gang committed the crime; [¶] 2. The defendant knew that the gang member intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the gang member in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the commission of the crime.  [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

[14]     The trial court instructed the jury on count 2 with the identical version of CALCRIM No. 2542.  Prince does not challenge the instruction as to that count.

As discussed, a true finding under section 25850, subdivision (c)(3), required the jury to find Prince had willfully assisted, furthered or promoted felonious criminal conduct by members of the gang either by directly committing a felony offense or aiding and abetting a felony offense. The jury was also required to find that at least two members of the same gang must have participated in committing the predicate felony offense. While the jury was not specifically instructed on the underlying felony the prosecution alleged Prince had directly committed or aided and abetted, the jury separately found Prince and Anderson committed attempted voluntary manslaughter in 2015. In addition, the jury's true finding as to the gang sentencing factor on count 2 necessarily included a finding Prince had willfully assisted, furthered or promoted felonious criminal conduct. Given these findings, a properly instructed, rational jury could not have reached a different conclusion than that Prince assisted, furthered or promoted felonious criminal conduct prior to August 30, 2015. Any error was harmless beyond a reasonable doubt.

3. *The Trial Court Did Not Err in Precluding Testimony Regarding Statements by Radele Blackburn*

a. *Relevant proceedings*

Prior to trial Prince stated he intended to call Radele Blackburn to testify as a percipient witness. In November 2018, while in custody on an unrelated matter, Blackburn told Prince's investigator he had been present at the shooting on August 30, 2015. Blackburn said he had arranged to meet Jackson at the liquor store that night to sell him marijuana. While outside the store, Blackburn saw Jackson approach Prince and Anderson and ask where they were from. Jackson then repeatedly yelled at

29

Prince and Anderson to give him their money. According to Blackburn, Jackson was very aggressive and had his hand in his pocket in such a way that Blackburn thought Jackson might have a gun. Blackburn did not want to get involved, so he walked away. He heard shooting but did not see who had fired the shots. Blackburn also told the investigator Jackson was "known for carrying guns and robbing people." Prince argued Blackburn's testimony would impeach Jackson by establishing Jackson was a drug user and would bolster Prince's account Jackson had acted aggressively prior to the shooting.

At the time of trial in January 2019, Blackburn was in custody awaiting his own trial on three felony charges to which he had pleaded not guilty by reason of insanity. He was also a person of interest in an unsolved homicide and had multiple prior convictions, including crimes of moral turpitude. Blackburn was believed to be a member of a Crips-affiliated criminal street gang.

Blackburn took the witness stand outside the presence of the jury and invoked his Fifth Amendment privilege against self-incrimination, stating he would do so for all questions. Counsel representing Blackburn informed the court he had advised Blackburn to assert the privilege. The trial court accepted Blackburn's assertion of the privilege and denied Prince's motion, in which Anderson joined, to compel the prosecutor to grant use immunity or to grant judicial immunity to Blackburn.

Prince then requested the defense investigator be permitted to testify pursuant to Evidence Code section 1230 about Blackburn's November 2018 statement. Anderson joined the request. The prosecutor argued the statement was not reliable, citing Blackburn's history of felony convictions and the fact he and both defendants were all members of Crips-associated

gangs. The prosecutor also informed the court Blackburn had been in custody with Prince and Anderson in March 2018 and October 2018 and argued this contact, the latter only a few weeks before Blackburn's statement to the investigator, suggested the defendants may have pressured Blackburn to make a statement and coached him on what to say.

The trial court denied Prince's motion to allow the investigator to testify, finding it was duplicative and not probative: There was other evidence placing the defendants at the scene; Jackson had admitted being there to purchase drugs; and Jackson had stated it was a possibility he had been the initial aggressor. The court also found the testimony unreliable given Blackburn's criminal history, his gang association and his prior contact with Prince and Anderson.

b. *Governing law and standard of review*

Evidence Code section 1230 provides, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or propriety interest, or so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." "'The proponent of such [hearsay] evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.'" (*People v. Grimes* (2016) 1 Cal.5th 698, 741 (*Grimes*); accord, *People v. Duarte* (2000) 24 Cal.4th 603, 610-612.)

31

"The against-interest exception to the hearsay rule is 'inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant' [citations], and 'a declaration against penal interest must be "distinctly" against the declarant's penal interest' [citations]. Whether or not a statement is against penal interest can be determined only by considering 'the statement in context.'" (*Grimes, supra,* 1 Cal.5th at p. 741; accord, *People v. Duarte, supra*, 24 Cal.4th at pp. 610-612.) Accordingly, Evidence Code section 1230 does not authorize the admission "of non-self-inculpatory statements . . . made within a broader narrative that is generally self-inculpatory." (*Williamson v. United States* (1994) 512 U.S. 594, 600-601, [114 S.Ct. 2431, 129 L.Ed.2d 476]; see *Grimes,* at p. 715 [citing with approval *Williamson's* interpretation of the "analogous exception to the federal hearsay rule"].)

A trial court's decision whether a statement is admissible under Evidence Code section 1230 is reviewed for abuse of discretion. (*Grimes, supra,* 1 Cal.5th at pp. 711-712; *People v. Lawley* (2002) 27 Cal.4th 102, 153.)

### c. *The trial court did not abuse its discretion in excluding the investigator's testimony*

By invoking his Fifth Amendment privilege not to incriminate himself, Blackburn was, for purposes of the hearsay rule, unavailable as a witness. (Evid. Code, § 240, subd. (a)(1); *People v. Cudjo* (1993) 6 Cal.4th 585, 606-607.) However, the majority of Blackburn's statement to the investigator was not "specifically disserving" of Blackburn's penal interest. (*Grimes, supra,* 1 Cal.5th at p. 741.) There was no evidence Blackburn's statements regarding what he saw or his knowledge of Jackson's

reputation had any bearing on Blackburn's culpability in any ongoing case or investigation. Nor was there any explanation of how those statements could subject him to criminal liability. Further, his account of the shooting and Jackson's reputation was not inextricably tied to a statement against penal interest such that it fell within the Evidence Code section 1230 hearsay exception. (See *Grimes,* at p. 716 [non-inculpatory portions of statement may be admissible under Evidence Code section 1230 when "'inextricably tied to and part of a specific statement against penal interest'"].) Accordingly, those aspects of Blackburn's statement were not admissible.

Blackburn's statement to the investigator that he was at the liquor store to sell marijuana to Jackson arguably fell within the scope of Evidence Code section 1230. Although Anderson contends this testimony was crucial to undermine Jackson's credibility as a witness, Jackson admitted he was at the liquor store that night to buy marijuana. The trial court was well within its discretion to exclude Blackburn's confirmation of that fact as unnecessary and duplicative.

### 4. *The Trial Court Did Not Abuse Its Discretion by Admitting David Kim's Expert Testimony*

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a); see *Brown v. Colm* (1974) 11 Cal.3d 639, 645 [expert is qualified if he or she "has sufficient skill or experience in the field so that his [or her] testimony would be likely to assist the jury in the search for the truth"].) Evidence Code section 801, governing the admissibility of expert testimony provides, "If a witness is testifying as an

33

expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

"The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse." (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322; accord, *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 ["[e]xcept to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion"]; *People v. Robinson* (2005) 37 Cal.4th 592, 630 ["trial court's determination to admit expert evidence will not be disturbed on appeal absent a showing that the court abused its discretion in a manner that resulted in a miscarriage of justice"].) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ""*clearly lacks* qualification as an expert."""" (*People v. Farnam* (2002) 28 Cal.4th 107, 162.) """"Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the

34

weight of the evidence than to its admissibility.""'" (*People v. Nelson* (2016) 1 Cal.5th 513, 536.)

"As with expert qualifications, we review trial court decisions about the admissibility of evidence for abuse of discretion.  Specifically, we will not disturb a trial court's admissibility ruling "'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"" (*People v. Morales* (2020) 10 Cal.5th 76, 97.)

As discussed, David Kim testified that, in his opinion, the seven shell casings found at the scene were not fired by Prince.  His opinion was primarily based on three observations:  Due to the intensity of the muzzle flash in the video, Kim concluded Prince had fired a revolver, which would not have ejected shell casings; Kim did not believe Prince could have fired seven shots in the short period he was seen shooting in the video; and, even if Prince had been firing a weapon that ejected shell casings, based on where Prince had been standing in the video, the shell casings would have landed in different positions than where they were found.  Anderson's counsel objected that this testimony lacked foundation and was speculative.  The objections were overruled.  Anderson challenges that ruling on appeal.[15]

_____

[15]    Anderson also argues for the first time on appeal that Kim's testimony should have been excluded pursuant to Evidence Code section 352 because its probative value was substantially outweighed by the danger of undue prejudice.  Anderson forfeited any abuse-of-discretion claim under section 352 by failing to object on this ground in the trial court. (Evid. Code, § 353, subd. (a); see *People v. Abel* (2012) 53 Cal.4th 891, 924 ["'[a] party cannot argue the court erred in failing to conduct an analysis it

35

The trial court did not abuse its broad discretion in permitting Kim's opinion evidence. Kim testified he had recently retired from the Los Angeles County Sheriff's Department where he had been a firearms instructor for more than four years and then a forensic firearms examiner for 15 years. He had attended several tactical and firearms trainings, as well as three years of firearms-examiner training. He was also a "certified armorer gunsmith." During his career Kim had conducted more than 150 crime scene investigations, and he continued to teach crime scene investigation and evidence handling at the Sheriff's academy after his retirement. In preparation for his testimony in this case, Kim stated he had reviewed the crime scene reports, surveillance videos, ballistic reports and video recordings and photographs of the scene taken by deputy sheriffs the night of the shooting and had visited the crime scene. Kim prepared a diagram showing the locations of each recovered shell casing based on his review of this evidence. During his testimony Kim explained how the evidence he reviewed supported his conclusion Prince had not fired the shots producing the seven shell casings. On this record the trial court did not err in finding Kim's opinions had an adequate foundation and were based on his training and experience. (See *People v. Morales*, *supra*, 10 Cal.5th at p. 100 [expert's opinions did not lack foundation when based on trial evidence, training and experience]; *People v. Robinson* (2005) 37 Cal.4th 592, 631-632 [same].)

was not asked to conduct"].) His objection to the testimony on other grounds was insufficient to preserve this issue for appeal. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 412-413.)

Anderson's arguments that Kim's opinions lacked foundation because he did not take his own measurements at the crime scene, his opinion on the location of the shell casings was only an approximation and he could not determine precisely from the video when Jackson had first been shot go to the weight of Kim's testimony, not its admissibility, and are thus matters for the jury. (*People v. Morales, supra,* 10 Cal.5th at p. 101 [weaknesses in expert's testimony, including that he did not examine evidence first hand and did not use actual weapons in recreation, "go to the weight to be given the evidence, not its admissibility"]; see also *People v. Dennis* (1998) 17 Cal.4th 468, 519 [expert may be impeached by cross-examination or by showing error in data upon which opinion is based]; *People v. Stoll* (1989) 49 Cal.3d 1136, 1159 [issues regarding expert's methodology are subject of cross-examination].)

5. *Anderson Forfeited His Prosecutorial Misconduct Arguments and Has Not Established Ineffective Assistance of Counsel*

   a. *Governing law and standard of review*

""""A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."""" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332; accord, *People v. Cortez* (2016) 63 Cal.4th 101, 130.) Bad faith by the prosecutor is not required. (*People v. Hill* (1998) 17 Cal.4th 800, 821.) In this regard, "'[t]he term prosecutorial "misconduct"

is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667 (*Centeno*); see *People v. Sandoval* (2015) 62 Cal.4th 394, 438.)

It is misconduct to misstate the facts or refer to facts not in evidence. (*People v. Linton* (2013) 56 Cal.4th 1146, 1207; *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353.) Nevertheless, a prosecutor enjoys wide latitude in commenting on the evidence, including identifying reasonable inferences derived from the evidence. (See *People v. Edwards* (2013) 57 Cal.4th 658, 736 ["[a] prosecutor's 'argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom'"]; *People v. Hill, supra*, 17 Cal.4th at p. 823 [same].)

It is also prosecutorial misconduct to misstate the applicable law. (*People v. Gray* (2005) 37 Cal.4th 168, 217.) As with any other claim of prosecutorial misconduct, however, "[a] prosecutor's misstatements of law are generally curable by an admonition from the court." (*Centeno, supra*, 60 Cal.4th at p. 674.) The failure to object and request an admonition forfeits the issue unless "the prosecutor's argument [was] so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*Ibid.*; accord, *People v. Charles* (2015) 61 Cal.4th 308, 327 ["'"[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument"'"].)

When the issue has been preserved, we review a trial court's ruling regarding prosecutorial misconduct for abuse of

discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) A defendant's conviction will not be reversed for prosecutorial misconduct that violates state law "'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070-1071; accord, *People v. Lloyd* (2015) 236 Cal.App.4th 49, 60-61.)

b. *Anderson's argument based on the prosecutor's mischaracterization of the law has been forfeited; he has not established ineffective assistance of counsel*

During his opening statement the prosecutor explained the People's case relied partially on a theory Anderson was guilty of attempted murder as an aider and abettor. The prosecutor stated, "A person is equally guilty of the crime, whether he committed it personally or aided and abetted the perpetrator who committed it. . . ." "[T]hey're both equally in violation of the law." The objection of Anderson's counsel was sustained, and the statement stricken. The prosecutor then stated, "An aider and abett[or] is as equally responsible as the person who attempts to kill." Neither defendant's counsel objected.

During his closing argument the prosecutor again stated Anderson, if found to be an aider and abettor, was "equally guilty," "equally in violation of the law" and "just as responsible as the person who attempts to kill." Neither defendant's counsel objected.

Anderson argues the prosecutor misstated the law of aider and abettor liability because an aider and abettor is not necessarily as equally culpable as the direct perpetrator. Other than the sustained objection during the prosecutor's opening statement, however, Anderson did not object to any of the

39

statements he now identifies as a mischaracterization of the law. Accordingly, he has forfeited that argument. (*People v. Charles, supra*, 61 Cal.4th at p. 327; *People v. Williams* (2013) 58 Cal.4th 197, 274.)

Acknowledging the argument has been forfeited, Anderson contends his trial counsel was ineffective in not objecting to the prosecutor's remarks. "'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.'" (*Centeno, supra*, 60 Cal.4th at p. 674; accord, *People v. Lopez* (2008) 42 Cal.4th 960, 966.) To prevail on his claim of ineffective assistance of counsel, Anderson must demonstrate his counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms and, because of those deficiencies, there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 80 L.Ed.2d 674]; accord, *Centeno*, at pp. 674, 676.)

"'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."' When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was '"no conceivable tactical purpose"' for counsel's act or omission.' '[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one . . .[,' and] 'a mere failure to object to

evidence or argument seldom establishes counsel's incompetence.'" (*Centeno, supra*, 60 Cal.4th at pp. 674-675, citations omitted; accord, *People v. Jackson* (2016) 1 Cal.5th 269, 349.)

Here, the prosecutor's statements an aider and abettor is as equally guilty as the direct perpetrator is "generally correct in all but the most exceptional circumstances." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165; accord, *People v. Loza* (2012) 207 Cal.App.4th 332, 349 ["'[g]enerally, a person who is found to have aided another person to commit a crime is "equally guilty" of that crime'"].) To the extent the statement may be misleading in certain circumstances (see *Samaniego*, at pp. 1164-1165), it is entirely possible counsel elected not to object to expedite argument and avoid continued emphasis on the suggestion Anderson was guilty by association with Prince. In fact, in his opening brief, Anderson acknowledges counsel may have failed to object for this very reason, stating, "[A]n additional objection would have had the opposite effect, calling the jury's attention to the very thing the defense would not have wanted—jurors relying on their finding Prince was guilty to convict [Anderson]." On this record, which is silent on counsel's reasons for not objecting, we cannot say there was no conceivable tactical reason for counsel's failure to object to the remarks Anderson now challenges on appeal.

c. *The prosecutor did not engage in prejudicial misconduct when discussing the surveillance video during his opening statement*

During his opening statement the prosecutor played the surveillance video for the jury. While doing so, he described what was occurring in the video. For example, he stated, "The

41

evidence will show in the upper left hand corner of the frame there's a person in a white T-shirt standing on Kingtree Avenue as Mr. Prince and Mr. Anderson exit the store.  The evidence will show that they go down the sidewalk and then they turned back towards the person in the street in the upper left hand corner in the white T-shirt.  Suddenly Anderson goes forward and Prince follows."  Defense counsel objected a number of times while the prosecutor was discussing the video; most of the objections were overruled.

When the prosecutor concluded his opening statement, Anderson's counsel moved for a mistrial based on prosecutorial misconduct, arguing the opening was "so rife with [the prosecutor's] opinion and his testimony I don't think it can be cleaned up."  The trial court denied the motion, explaining, "[T]here were a few times where [the prosecutor] did become a bit argumentative in his describing what he believes the evidence will show.  When that was raised he correctly adhered to what is considered to be opening statement. . . .  I do not believe that his opening statement rises to the level of prosecutorial misconduct."  The court noted it had already admonished the jury regarding the role and purpose of opening statements and asked counsel if they wished to have the jury admonished again.[16]  Counsel declined.

---

[16]     Immediately prior to the prosecutor's opening statement the trial court informed the jury, "It is now time for the attorneys to give their opening statements if they choose to do so.  Remember what they say is not evidence in this case, it is merely an outline of what they expect the evidence in this case to show."  Again during Prince's counsel's opening statement the jury was admonished, "Everything at this point is a statement of what each attorney expects the evidence to show."

42

The trial court did not err in ruling the prosecutor's remarks did not constitute prosecutorial misconduct. "The purpose of the opening statement "'is to prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force and effect.""" (*People v. Fauber* (1992) 2 Cal.4th 792, 827.) "It is axiomatic that nothing the prosecutor says in an opening statement is evidence." (*Ibid.*) "'[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor "was 'so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted.""" (*People v. Dykes* (2009) 46 Cal.4th 731, 762; accord, *People v. Cole* (2004) 33 Cal.4th 1158, 1203 ["prosecutors 'have wide latitude to discuss and draw inferences'"; whether inferences are reasonable is for the jury to decide].)

In this case the jury was instructed that the prosecutor's opening statement did not constitute evidence. Any inconsistencies between the prosecutor's description of the video and what it actually portrayed would have been readily apparent to the jury during the opening statement or the many other times it viewed the video over the course of the trial. Anderson does not contend the prosecutor referred to any evidence that was not admitted at trial nor has Anderson disputed the accuracy of the prosecutor's descriptions of the video. The prosecutor's statements were well within the wide scope of permissible descriptions of evidence and did not constitute misconduct.

6. *Anderson's Sentence Does Not Violate Section 654; Prince's Sentence Requires Correction*

a. *Governing law and standard of review*

Section 654, subdivision (a), provides, "An act or omission that is punishable in different ways by different provisions of law

shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

The determination whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry. First, the court considers whether the different crimes were completed by a single physical act. If so, the defendant may be punished only once for the single act. (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) If more than a single act is involved, that is, a "course of conduct," then the court considers whether "that course of conduct reflects a single '"intent and objective"' or multiple intents and objectives." (*Ibid.*) If multiple acts were pursued with a single criminal intent and objective, "'"the defendant may be punished for any one of such offenses but not for more than one."'" (*People v. Jackson*, *supra*, 1 Cal.5th at p. 354; accord, *Corpening*, at p. 311.)

A trial court's section 654 determinations based on disputed facts are reviewed for substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731; *People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 [trial court "is vested with broad latitude" in making its section 654 determination and court's "findings will not be reversed on appeal if there is any substantial evidence to support them"].)

b. *The trial court properly sentenced Anderson for possession of a loaded firearm*

Anderson contends his sentence for possession of a loaded firearm (count 4) should have been stayed under section 654 because it was part of the same act as the attempted voluntary manslaughter. However, section 654 does not bar separate punishments for unlawfully possessing a firearm and a crime

committed with the firearm when those offenses were committed by separate acts not part of an indivisible course of conduct. Unless the evidence "demonstrates 'at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense,'" punishment for both offenses is proper. (*People v. Jones*, *supra,* 103 Cal.App.4th at p. 1144 [section 654 did not bar punishment for both possession of firearm by felon and shooting at inhabited dwelling]; cf. *People v. Bradford* (1976) 17 Cal.3d 8, 22-23 [where defendant wrestled away officer's revolver and shot officer with it, punishment for both assault with deadly weapon on peace officer and possession of firearm by felon was prohibited by section 654].)

Here, the inference that Anderson arrived at the scene of the crime already armed with a loaded firearm was reasonable and supported by substantial evidence. There was no evidence Anderson picked up a firearm in the vicinity of the liquor store immediately before the shooting. Further, nothing in the surveillance video could be interpreted as Anderson finding and grabbing a weapon from a location other than on his person. The only reasonable inference is that Anderson possessed the firearm prior to, and separate from, his encounter with Jackson. (See *People v. Jones, supra*, 103 Cal.App.4th at p. 1147 ["[i]t strains reason to assume that Jones did not have possession for some period of time before firing shots at the Walter home. Any other interpretation would be patently absurd"].) Under these circumstances section 654 does not prohibit punishment for both attempted voluntary manslaughter and firearm possession. (*Ibid.*; see also *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378 [evidence that defendant arrived at scene of kidnapping and carjacking already in possession of firearm was sufficient to show

that defendant harbored separate intent and objective in illegally possessing firearm and in using firearm in commission of kidnapping during carjacking].)

    c. *The trial court properly sentenced Prince on both counts of carrying a loaded firearm*

Prince was convicted on counts 2 and 6 of carrying a loaded firearm while an active participant in a criminal street gang. The jury also found true Prince committed the offenses for the benefit of a criminal street gang pursuant to section 186.22, subdivision (b). Prince contends his sentences for the enhancements should have been stayed under section 654 because they were based on the same physical act as the substantive offenses, "namely, carrying a loaded gun while being an active participant in a criminal street gang."

Prince's argument rests on a fundamental misapprehension of applicable law. As discussed, conviction for carrying a loaded firearm while an active participant in a criminal street gang (§ 25850, subd. (c)(3)) requires proof of each element of section 186.22, subdivision (a)—actively participating in a criminal street gang with knowledge its members engage in or have engaged in a pattern of criminal gang activity and willfully promoting or assisting in any felonious conduct by members of the gang. (*People v. Infante, supra*, 58 Cal.4th at p. 692.) Section 186.22, subdivision (b)(1), on the other hand, provides for a sentence enhancement for any person convicted of a felony that was committed for the benefit of, at the direction of, or in association with any criminal street gang with the specific intent

to promote, further or assist in any criminal conduct by gang members.  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)[17]

As the Supreme Court has explained, "Section 186.22(a) and section 186.22(b)(1) strike at different things."  (*People v. Rodriguez, supra*, 55 Cal.4th at p. 1138.)  Subdivision (b)(1) seeks to punish felonies committed to benefit the gang, regardless of whether the defendant is a gang member.  (See *People v. Albillar* (2010) 51 Cal.4th 47, 68 [a true finding under section 186.22, subdivision (b)(1), "does not depend on membership in a gang at all"].)  Subdivision (a) seeks to punish gang members who have committed a felony in concert with other gang members, regardless of whether the felony was related to the gang. (See *Rodriguez,* at p. 1138; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 [section 186.22, subdivision (a), "'is a substantive offense whose gravamen is the participation in the gang itself'"].)

In determining whether section 654 prohibits multiple punishments for sentence enhancements and sentencing factors,

---

[17]    A "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain enumerated] criminal acts[,] . . . having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity."  (§ 186.22, subd. (f).)  A "'pattern of criminal gang activity' means the commission of . . . or conviction of two or more of [certain enumerated offenses]" that "were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).)

the analysis is adjusted to account for the differing nature of substantive crimes and enhancements. (See *People v. Ahmed* (2011) 53 Cal.4th 156, 163.) "[E]nhancement provisions do not define criminal acts; rather, they increase the punishment for those acts. They focus on *aspects* of the criminal act that are not always present and that warrant additional punishment." (*Ibid.*) Separate enhancements or sentencing factors may be applied to different aspects of the same substantive offense, but "section 654 bars multiple punishment for the same *aspect* of a criminal act." (*Id.* at p. 164.) "If section 654 barred *any* additional punishment for a single criminal act, then no enhancement at all would be permitted, a result obviously inconsistent with the function of sentence enhancements." (*Ibid.*)

Here, the sentencing factor and enhancement imposed on the firearm convictions penalized different aspects of Prince's crimes: The section 25850, subdivision (c)(3), sentencing factor applied because of Prince's status as an active gang member when he carried a loaded firearm; the purpose of the offenses was irrelevant. The section 186.22, subdivision (b)(1), enhancement applied because the offense was committed, at least in part, to benefit the gang; Prince's status was irrelevant. Because the sentencing factor and enhancement punished different aspects of the crime, sentencing under both provisions did not violate section 654. (Cf. *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1514 ["section 654 does not prohibit punishing a defendant both for violating section 186.22, subdivision (a) and for the underlying crime committed for the benefit of the gang when the two offenses involve different objectives"].)

d. *Prince's sentence for unlawfully possessing ammunition on August 30, 2015 must be stayed pursuant to section 654*

Prince contends, the Attorney General concedes, and we agree the trial court erred in failing to stay under section 654 the sentence for Prince's conviction for unlawfully possessing ammunition on August 30, 2015, charged in count 3.

Prince was convicted of carrying a loaded firearm on the night of the shooting (count 2) and of unlawfully possessing ammunition at the same time (count 3). It is undisputed, however, that the only ammunition Prince possessed was loaded in the firearm. On these facts substantial evidence does not support a finding Prince had more than one objective in possessing the loaded firearm and the ammunition. (See *People v. Broadbent* (2020) 47 Cal.App.5th 917, 923 [trial court erred in not staying sentences imposed for sale of firearms and sale of large-capacity magazines where firearms were sold with magazines]; *People v. Sok* (2010) 181 Cal.App.4th 88, 100 [trial court should have stayed sentence for defendant's possession of ammunition where it imposed sentence for unlawful possession of firearm and ammunition was either loaded into the firearm or had been fired from the firearm]; *People v. Lopez* (2004) 119 Cal.App.4th 132, 138 [trial court erred in failing to stay sentence for possession of ammunition where the ammunition was loaded into the firearm and defendant's intent was to possess a loaded firearm].)

7. *Anderson Has Forfeited the Argument the Trial Court Abused Its Discretion by Imposing Consecutive Sentences for Attempted Voluntary Manslaughter and Possession of a Loaded Firearm*

The trial court has "broad discretion to decide . . . whether to run the prison terms on multiple offenses concurrently or consecutively." (*People v. Clancey* (2013) 56 Cal.4th 562, 579.) California Rules of Court, rule 4.425 sets forth specific criteria affecting the decision, including the presence of circumstances in aggravation or mitigation. The trial court must generally state its reasons for choosing to impose consecutive sentences (Cal. Rules of Court, rule 4.406(b)(5)), but "there is no requirement that, in order to justify the imposition of consecutive terms, the court find that an aggravating circumstance exists." (*People v. Black* (2007) 41 Cal.4th 799, 822.) "In imposing an upper term, the court must set forth on the record 'facts and reasons' [citation], including the 'ultimate facts that the court deemed to be circumstances in aggravation.' [Citation.] But it need only cite 'reasons' for other sentencing choices (§ 1170, subd. (c)), and the reasons given for imposing a consecutive sentence need only refer to the 'primary factor or factors' that support the decision to impose such a sentence. (Cal. Rules of Court, rule 4.406(a), (b); § 1170, subd. (c); see *People v. Tran* (1996) 47 Cal.App.4th 759, 774.)" (*Black*, at p. 822.)

At the sentencing hearing the trial court heard arguments from the parties regarding section 654 and allowed the attorneys to make arguments regarding mitigating and aggravating factors. The court then took a recess to calculate the sentences, after which it stated it had reviewed the sentencing memoranda and attachments as well as the probation reports. The court stated, "I am persuaded by the People's argument with respect to

the sentencing structure being one of consecutive as opposed to concurrent. I am also not inclined to stay any part of the sentence pursuant to Penal Code section 654; I think that the jury verdicts are indicative of what they thought with respect to the crimes that were committed. I am persuaded by the People's argument that these were acts that could be divided with respect to the attempted voluntary manslaughter and the gun." The court then pronounced the sentences and asked if the parties wished to be heard further; the prosecutor and Prince's attorney each made a brief record regarding ancillary issues. Neither Prince nor Anderson's counsel objected to the sentences imposed.

Anderson requests we remand his case for resentencing because the trial court failed to state its reasons for imposing consecutive sentences for attempted voluntary manslaughter and possession of a loaded firearm (counts 1 and 4). However, Anderson's failure to object at sentencing to the imposition of consecutive sentences forfeited his contention. (See *People v. Boyce* (2014) 59 Cal.4th 672, 730 ["'complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal'"]; *People v. Gonzalez* (2003) 31 Cal.4th 745, 751 [same]; *People v. Scott* (1994) 9 Cal.4th 331, 353 [same].)

In his reply brief Anderson argues the forfeiture rule should not apply because the trial court "announced its decision without a statement of any specific factors it considered or found outweighed factors in mitigation, leaving no opportunity for a meaningful objection." This argument is without merit. The trial court's announcement of the sentences, followed by counsel's opportunity to raise additional issues, gave Anderson sufficient opportunity to object or seek clarification. (See *People v.*

*Gonzalez, supra*, 31 Cal.4th at p. 752 ["parties are given an adequate opportunity to seek such clarifications or changes if, at *any time* during the sentencing hearing, the trial court describes the sentence it intends to impose and the reasons for the sentence, and the court thereafter considers the objections of the parties before the actual sentencing"].) To the extent the court did not articulate at the hearing the aggravating factors supporting imposition of consecutive sentences, it was incumbent on trial counsel to seek clarification. This is precisely the kind of readily correctable error the forfeiture rule is intended to prevent.

8. *The Trial Court Failed To Impose or Strike Gang Enhancements on Prince's Ammunition Convictions (Counts 3 and 7)*[18]

Despite the jury's finding Prince had committed the offenses of unlawful possession of ammunition (counts 3 and 7)

---

[18] In some instances we will modify a sentence to impose or strike terms that were improperly stayed or omitted. However, when, as here, a sentence is composed of multiple elements as to which the trial court had some discretion (see, e.g., §§ 669 [vesting court with discretion to choose between concurrent and consecutive sentences]; 1170, subd. (b) [affording discretion to trial court to select among three statutorily authorized terms of imprisonment]), the appropriate remedy is to remand to permit the trial court to reconsider all components of the sentence. (See *People v. Salvador* (2017) 11 Cal.App.5th 584, 586-587 [court's erroneous imposition of sentencing enhancement on multiple counts favored remand for resentencing rather than modification]; *People v. Bradley* (1998) 64 Cal.App.4th 386, 400-401 [remand for resentencing is appropriate when sentencing choice within trial court's discretion].)

for the benefit of a criminal street gang, at sentencing the trial court failed to consider those enhancements.  Neither the People nor the court proffered a reason for omitting them, and we find no support for that decision in the record.[19]

On remand the court must either impose the additional punishment mandated under section 186.22, subdivision (b)(1)(A), or strike the additional punishment after making the findings specified in section 186.22, subdivision (g).[20]

## DISPOSITION

The judgment as to Anderson is affirmed.  Prince's convictions are affirmed.  Prince's sentence is vacated, and his case remanded for a new sentencing hearing.


PERLUSS, P. J.


We concur:


SEGAL, J.                          FEUER, J.

---

[19]    The parties do not raise this issue on appeal.  However, we have an obligation to correct an unauthorized sentence whenever it comes to our attention.  (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1044-1045; *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6].)

[20]    Section 186.22, subdivision (g), states:  "Notwithstanding any other law, the court may strike the additional punishment for the enhancements provided in this section . . . if the court specifies on the record and enters into the minutes the circumstances indicating that the interests of justice would best be served by that disposition."